Case No. 151880. This is a case on appeal from the District Court for the District of Maryland. Judge Wallach and I, this is déjà vu all over again because we're back up here after remand. That means I can rest during this one. Mr. Brown, you want three minutes for rebuttal? Good morning, Your Honors. Since we've been here before, I'm going to jump right into the central issue that was here before that we believe was the central issue the judge committed again on the second time around was the misapplication of the Inherency Doctrine. We think it's very clear from particularly the discussion on A-10 of the District Court's decision that she's conflated genus species law with the Inherency Doctrine and disregarded this court's clear instruction and this court's analysis in the first decision. Let me do a little housekeeping here. In the blue brief at 17, you quote the District Court as stating that Dr. Beach quote spoken generalities. In fact, the District Court said that Dr. Beach sometimes spoken generalities. At 26, you say the District Court recognized that Dr. Beach's testimony had serious shortcomings that prevented it from serving as clear and convincing evidence of inherency. In fact, the District Court said his testimony might not independently satisfy TWI's inherency burden, but that his quote his testimony nonetheless strengthens TWI's case. Let me ask you two questions. One, why do you leave out the word sometimes if that doesn't substantially change the meaning of the court's statement? I apologize for that, Your Honor. In my estimation, the entirety of the testimony relating to this issue was in generalities, and I think the entirety that the District Court quoted with respect to both the enablement and the inherency issues were... I don't think there's a difference, though, between sometimes the court's determination that Dr. Beach sometimes spoken generalities and the court saying he spoke in generalities? There is certainly a difference. There is certainly a difference between those two, Your Honor, and I apologize for that. What statement of the District Court supports the assertion that Dr. Beach's testimony had serious shortcomings? I believe that is our characterization of the impact of that, which is when she said that his testimony might not serve to independently serve as clear and convincing evidence of inherency, we believe that echoes the finding this court already made the first time the court considered the exact same testimony and found that it did not. When the court says his testimony nonetheless strengthens DWI's case, it's evidence she relied on to... It's evidence she relied on in support of the finding of inherency, but in our position of it, she relied... This court already considered that testimony the first time around, found it was insufficient. We said it wasn't enough standing alone, and she's agreeing that it's not enough standing alone. Correct. But then she goes on to say it's not standing alone. Correct. Okay, so there was a different... There's a different record now. It's that testimony taken in the context of the other things on which she based her factual findings. That is correct. And so we believe there are two fundamental errors in what happened in that analysis by the District Court. First of all, we think it is clear from the discussion on A10 of her decision that she is applying the inherency doctrine in combining it and conflating it with genus species law, and she makes the statement, in the context of obviousness, examples are enough. And this court's previous analysis of the inherency doctrine made clear that the same analysis applies in the anticipation context as in the obviousness context. And the reason we are getting to inherency in the first instance, the only reason inherency is relevant in an obviousness analysis is because the prior art, on its own, did not suggest or motivate arriving at the limitation. There's no dispute. It's based on the finding, the previous finding. The food effect was unknown. We discovered that. We also discovered a particular solution to that food effect, and we included the food effect limitations. There's no motivation to get there, and there is no description of that limitation. That was all decided in the prior case. That was all decided in the prior case. But the only reason we're getting to inherency is because of that. So the clear import, we believe, of the court's previous decision is, unless the skill of artisans, sitting with all of the art which relied on for obviousness, with the motivations found by the district court, will necessarily and inevitably solve the food effect, while not pursuing it, pursuing other motivations, but will inevitably necessarily solve the food effect that's required for inherency. We think it's clear from her analysis on page A10, and she cites this In Re Coso case, which is a genus species case, juxtaposed to the sentence, in the context of obviousness, examples are enough. She's applying that if, when you combine that art, if some of the things you get necessarily have the property, that's enough for inherency. We would submit that's no different than saying probabilities are possibilities. If you sometimes always get the result, then it's inherent. That flows into my second principle argument on inherency, which is the record. The only testimony at trial, this case was not an inherency case at trial. Dr. Beach did not get on the stand and say, if you do X, Y, and Z, you will always get something else. He was testifying principally that the food effect was known. That was his principle argument. The trial court came up with the concept of inherency on her own. It was argued post-trial in the briefs, but it was not presented at trial. He doesn't have the testimony you would normally see in an inherency case. This court considered the strongest testimony last time around, found it wasn't enough on its own. She went back now and went into our examples in our patent that are not in the prior art. They were the result of substantial work knowing about the food effect that we discovered. There's column after column after column in the patent describing how they tested a bunch of variations, and they finally got to example nine, a preferred embodiment. It's very particular. We lay out the formulation of that in our reply brief. It's got a whole bunch of examples, a whole bunch of particular ingredients. That solved the food effect. That's not evidence that what somebody of ordinary skill in the art would have necessarily done without the benefit of our specification would inevitably get. Then she took our commercial embodiment, which was derived directly from that, and then TWI's commercial embodiment, which was derived directly from ours. Those three data points are not, we would submit, they're not evidence of a necessary result. They don't provide the necessary relevance. Nobody addressed these, and we think this falls squarely within the cases we've cited, that this cannot be done on attorney argument. Nobody testified about these three examples at trial. We get to put on an expert that says that's not true. We have all kinds of rights that flow from this, and this court has said in numerous cases we cite, you've got to have expert testimony to say this. That's where we think, in effect, we've cited this also as a burden shift case. I normally don't raise a burden shift because it's not something that normally succeeds here. You raised it the last time. We did because we feel like the unfairness of it in this instance, if we're going to be hit with an inherency case, we deserve to know it at trial. The expert's got to get on the stand and say it, and she's effectively saying, we've got a dog study in the patent that gets results outside the claim. If TWI wanted to show inherency, they should have talked about that and explained it. They didn't. We didn't put on an expert to respond about it, and so there's no record on it. Did you ask her to reopen discovery for purposes of this follow-on procedure? No. Neither party asked the case to be reopened. It was re-argued on the same record that was based on the review. It's hard for you to argue surprise to us or unfairness when you didn't ask the court or explain to the court why you might need any additional material or an additional opportunity to present an expert. Well, it was TWI's at the first trial. It was their burden of proof to carry their case. They did not put on an inherency case. No one got on and said, when I do certain things, I necessarily get a certain result. So we weren't responding to that, and on remand, they were stuck with the record, we believe. If they wanted to reopen it and put on more evidence, we believe they should have been stuck with the record that they tried. That's what we didn't even realize opening the record was something that was an option. We thought this was a remand on the same record. And it probably was. I'm just asking. Yes. All right. Let's talk about enablement. Yes. Okay. So what are your complaints about the trial court's determination as it relates to enablement? Certainly. So her enablement discussion, the principle complaint we have, it runs from A12 to A13, and she has two statements that basically no amount of experimentation would allow the claims to be practiced outside of this particular 100 to 700 nanometer range that she selects, and that it would make it practically impossible. And TWI on page 51 of their brief makes the same statement, and they cite the record. There are precisely two pages of the record that are cited in the district court and in TWI's brief on enablement. It's A3113 and A3119. And on those pages, Dr. Beach doesn't say anything that we think can fairly support this practically impossible. It's the same testimony we talked about last time. It is very general, and it says, if I can pick out a couple, as we go up in particle size from that to micron particle size and larger, we get very large particles and decreased bioavailability. He doesn't say that with work and formulation and the teachings of the patent and all the examples that this can't be overcome. He says we get decreased bioavailability as we go down in particle size below a certain cutoff. Let's call it, for sake of this, 100 microns. The particles tend to re-aggregate and begin to act as large particles. Again, no statement that it's impossible, no statement that it can't be done, no statement of what type of work needs to be done. We think this case falls squarely within the Cephalon-B. Watson case, where, again, it's more or less the statement that, and we think the critical part of it, appears on A3119. He's giving the printable part of his testimony. If it's less than 100 nanometers or greater than 750 nanometers, this is lines 16 through 20, then it's really not enabled because there is nothing in the patent that shows me particle sizes of the product in that range that meet claims of the patent. He's effectively saying the patent doesn't show me examples in this range, therefore, it's not enabled. He doesn't do any analysis of any of the Wands factors, other than this general statement. In fact, the district court found he considered the Wands factors. She cites page A3119, lines 12 to 16. I'll read the entirety. Doctor, was it explained to you that there are several factors to consider in determining whether there is undue experimentation? Answer, yeah. I was educated as to what enablement consists of by counsel. Let's worry about whether we can talk about whether he's properly invoked the language of the Wands factors. Let's look at the specification. Show me where in the specification there is anything that would teach these hugely broad ranges. So there are a couple of significant points within the specification that one of the significant ones that our expert testified about at trial was a discussion of multimodal particle size distributions. Since the claims define it as by weight, our expert pointed out that you could, I don't have a specific citation, I can find it in a second, but since the claims are by weight, you could have a large population of very small particles and a few larger particles and someone would be able to circumvent a narrower claim. With that, you can still have the effective average be higher up near 2000 and get what's important. We cite this in our reply brief. There's a chart on page 10 of our reply brief that our expert introduced during trial. In that chart, the patentees obtained food effects ranging from 55 percent, the upper end of the narrowest claim, down to 8 percent and that's effectively negative 8 percent, but fasted CMAX was higher, got this full range. One variable was changed, which was dose concentration. They were loading more drug, concentrating more drug and less vehicle. That one factor was able to cause a very significant impact on the food effect. The dog study, they got a significant change by changing the identity and the amount of the surfactant. They went from around 70 to 85 percent food effect. There are significant things that can be changed. They identify surface stabilizer, they identify the surfactant, they identify the amount of the vehicle as things that are shared. The trial court, as the dog study trial court made a specific finding that it was not particularly informative because there was differences between food effects in humans and in dogs. Almost. I want to point that out. There was no testimony about the dog study at trial. It was because there wasn't an inherency case put on. TWI argued based on one internal email that some scientists, I don't know what his qualifications are to talk about dog studies, said the results might not be the same. She made a fact finding on that, but there was no fact finding that above and below certain ranges, there was no sufficient bioavailability to result in a food effect. We would have to find that to be clear error in order for us to overturn her enablement determination. It would either be clear error or under the standard description in the Cephalon v. Watson case on enablement. We think that the case is right on point where this court has continually rejected conclusory enablement cases. You get up and say it's not enabled and you don't go through the factors. How much experimentation is required? What are the examples? There's a lot of examples in this patent. What are they? What do they teach a person of ordinary skill in the art? What would you do? Why is that insufficient? How much work would it take? It's simply Dr. Beach saying it's really not enabled because the patent doesn't give me examples in these higher ranges. That's really the sum total. There's two pages, A3113 and A3119. You've eaten up all your rebuttal time. We'll give you two minutes. Good morning, Your Honor. Don Mazurk on behalf of TWI. How do you respond to the argument that regardless of what kind of case you might have been able to testify to inherency, the district court came up with the concept of inherency after trial. How do we say that you had a sufficient record on inherency below to allow us to say that you really locked it down the second time around or that the trial court locked it down? Just on that point, the notion that we didn't argue an inherency case from the beginning is just false. We were arguing from the very beginning of the case in our pre-trial briefs everywhere around that we were relying on the Parr v. Santaris case where the court said that measuring the blood levels of an obvious formulation does not make it non-obvious, including those in the claims. We put in proof. We argued that from the beginning. That was the law at the time. We didn't have the benefit of this court's Parr v. TWI case, and we structured our proof along that to make the point and to show throughout the trial that all the patentee did here was substitute the prior art nanoparticles, magistral nanoparticles, which were explicitly disclosed in the… Did you have evidence to support the conclusion that you fell within the description of what you'd have to show that was in our original opinion? Yes, we did, Your Honor. We had Dr. Beach and even their own expert, Dr. Liversidge, all testified that the food effect reduction is a physical property of the particle size. The particle size is the only factor that has any bearing on the food effect. It's because of the Noyce-Whitney equation about the smaller the particle size, you increase the surface area of the compound, and that advances, increases the dissolution, the solubility. Then Dr. Beach and everybody testified about the improved solubility, improves bioavailability. Improved bioavailability naturally reduces the food effect because now the drug is so soluble, it's equally soluble as it is when it's ingested with food. But again, that still just talks about a generalized food effect. What evidence supported the conclusion that the food effect of the claimed ranges was necessarily inherent? Because of that, we were able to show that the particle size of the prior art was 100 to 400. And Judge Blake made a factual finding that the prior art disclosed use of majestural particles of 100 to 400, and we had the proof that the particles of this size produce the food effect that is claimed. She went to less than 60 percent because that was the smallest claim construction, and she took all the data that was before her on that point and was able to look at that. Yes, these particles of this size in the prior art produce necessarily the food effect. It is a physical property of the particles. These particles are there, and just like Your Honor did in the Alcon case, said that if it's the same particle, it's not unreasonable to say it gets the same effect. And that's what we proved. We proved it was the exact same thing, and the measurements of the particle size, these were the measurements were up to 330, were the D90s, and the data sets that were part of the record at trial that were all admitted to be producing food effect of well less than 60 percent. And should we be concerned about the trial court citation to Cuozo when that was a range case where the question of examples is a totally different animal than here? I mean, we specifically said that you've got to find inherency as to all of the claimed limitations. Yes, Your Honor, and the plaintiffs, the appellants, misrepresent what the judge did there. When the judge was citing, when she said that examples are enough, she was responding to their argument that we had to show that the food effect was necessarily present at all particle sizes they claimed, all the way up to 2,000 nanometers. And she said, that's not right. They show that this range, this example here between, she called it an example, but she meant that the range of 100 to 400 is within that 2,000, and so by showing that it's obvious that it's necessarily there between 100 and 400, they've proven the claim is obvious because a specific example will invalidate a genus. Okay, let's go to enablement, unless you have something else on hand? No, Your Honor, those are the two points I wanted to respond to. On enablement, again, I think they make two points. One was in this there is, we know that the food effect is a result of the reduced particle size, and so there's no way, based upon all the evidence and all the scientific, and there's only one example, there's only one particle size that is in the specification. That's 130, if you use the patent's nomenclature. So they have a range, they've claimed a range from zero to 2,000, which is really 2,200, and they have one example in terms of the particle sizes within that range, and that's 130 nanometers is the average particle size, and there's all the evidence in there that, for example, Dr. Beach talked about danosyl, he talked about all the other examples, we had the prior art, Dr. Liversidge explaining this technology, explaining how it works, explaining that it's exponential when you go, there's evidence at 3055, for example, where Dr. Beach testified, and there was an example about when you reduce danosyl particles from four microns to 0.45 microns, the increase in bioavailability was tenfold. So we know that it's exponential, the difference, as you approach the smaller particle size, and the improvements in bioavailability and the attendant food effect. So the district court's conclusion that it was the smaller the particle size, the more likely you're going to get the claimed benefits. I mean, there is actually a statement in the patent that basically supports the district court's finding that it's not operable, because they claim 2,000 to zero, and actually she was able to say that when you get down to a lower range of that, that 130, yes, you can get it, but then above that, you can't, because as you make the particles bigger, they become less soluble, you can't get the bioavailability, and there's no trick. There was no trick when Dr. Liversidge invented the nanocrystal technology to improve the solubility of the prior art, and so there's no other method that anybody talks about to overcome the intended problems of the solubility of these molecules. It may be hyper-technical, but I'm struggling with why we call that enablement. It's really failure-proof, isn't it? Well, no, it's enablement because the patentee has an obligation to enable a person of skill in the art to use the full scope of the claimed invention, and when you have a range... Less than 2,000, whatever that means. As of the year, right, but less than 2,000, and so the cases like the Magistral case and the Alcon case, I believe, are the ones that are most instructive here. If you claim a range, you have to enable the full scope of the range, and if someone later comes along and discovers how to get this food effect that's claimed with 2,000 nanometers in size, they're going to be blocked because the patentees here claimed it already, even though they didn't teach you how to do it, and so that's the problem here. It's like, well, you don't have to prove everything within the range, but you have to enable a full scope of the range, enough of the range, and here the court found that over two-thirds of the claimed range particle sizes were non-enabled, so that should be dispositive of the enablement case. There was one example, and Dr. Beach testified about every one of the WANs factors. We cited it in our brief. The district court was able to ascertain that testimony about each of the... We're not required to say, these are the WANs factors. Let's talk about WANs factors. No, he addressed every one of the WANs testimony, and then when the people argued the record, we were able to point to all the WANs factors were considered, but the main one here is that it really is impossible to practice this invention based upon what we know today and what we know back then outside of the sweet spot here, which is 130. Okay. Anything else? Thank you, Your Honor. Thank you. Help me understand, Mr. Brown, if you would, what's wrong with that enablement argument that your colleague made. Certainly. So there's a couple of things I'd like to address that are wrong with it. You do agree you have to enable the full range? Well, I think there's a couple of points here. First of all, there's no dispute that we enable independently the full scope of each range that you can make from 2,000 down to zero, and you can make the entirety of the food effect. So we're outside of MAGSO. We solve the food effect all the way down to zero. The argument they're making, which the district court characterizes the union argument, is we have to be able to do them both simultaneously. And so we don't think there's actual legal support for that. That doesn't fall with any of the cases. We don't claim, you don't fall within our claim unless you eliminate the food effect to the requisite amount. It's different than the Alcon case. And so we think, I haven't seen a case that directly addresses it either way, but we think that's outside of the scope of the court's existing jurisprudence. We enable the full scope of every range, unlike MAGSO, where you couldn't do above 12% and you claimed 10 to infinity. So it's a very different situation. But second, there is a failure of proof here. Dr. Beach didn't go through any sort of analysis like you would see in the Cephalon v. Watson case and address what would actually have to be done. I did want to address the page that counsel cited, page A3055. And at line 21 on that, the witness, I believe it's Dr. Beach, said, yes, for this specific compound, H0221. So he limited his testimony to Danazol. And incidentally, in the original district court decision, she rejected TWI's proposition that Danazol served as an appropriate model for majestural acetate. They argued that because of what was known about Danazol, you would know about the food effect and you would know all these other properties. She rejected that. She made a fact finding adverse to that. And so the record for enablement is what just doesn't meet this court's case law that has rejected conclusory enablement cases. Okay. Thank you. Cases will all be submitted.